**IN THE SUPERIOR COURT OF GUAM**

In Re:

INDIVIDUALS OR GROUPS OF
INDIVIDUALS QUARANTINED BY
DPHSS AS A RESULT OF EXECUTIVE
ORDERS AND DPHSS GUIDANCE
MEMORANDA

Superior Court Case No. <u>SP0206-20</u>

**DECISION AND ORDER RE: S.C. ON
BEHALF OF E.C., Jr., G.C., E.C., AND
E.C.**

The Court here addresses the request for relief filed by S.C. on behalf of her four minor

children, E.C., Jr., G.C., E.C., and E.C. After hearing testimony from S.C.; Dr. Thomas Shieh,

S.C.'s primary care physician; Chima Mbakwem, DPHSS' technical advisor and interim

administrator for infectious disease; and Dr. Felix Cabrera, DPHSS' Chief Medical Officer, the

Court upholds DPHSS' decision to quarantine S.C.'s four minor children. However, the Court

determines that the children's quarantine period restarted on March 1, not March 4.

Furthermore, because the evidence before this Court demonstrates that one's risk of

infectiousness subsides after day ten, assuming the children are asymptomatic, they must be

released after the tenth day in quarantine, which is today, March 11, 2021.

I.    **PROCEDURAL BACKGROUND**

On March 4, 2021, S.C. requested that this Court release her from home isolation and her

children from quarantine. Req. Hr'g (Mar. 4, 2021). S.C. isolated at home after being diagnosed

with contracting COVID-19 following a test administered on February 25 and a care provider's

instruction. DPHSS then required her four minor children to self-quarantine on the basis that

they were "close contacts" to S.C. On March 4, DPHSS released S.C. from home isolation and

"restarted the quarantine clock" for her four minor children.

The Court heard the request on March 8 and 9, 2021. As this matter concerns the quarantine of individuals due to COVID-19, the Court incorporates evidence presented during the earlier consolidated hearings that culminated in, among other rulings, the October 27, 2020 Findings of Fact and Conclusions of Law issued in *Ikei v. DPHSS*, SP0138-20. The Court also incorporates its Order Granting J.B.'s Request for Relief, filed on March 10, 2021. That Order concerned J.B., S.C.'s co-worker and close contact. The Court determined that even assuming S.C.'s isolation was reasonably necessary, and a fourteen-day quarantine was reasonably necessary, the fourteen days expired and J.B. should be released from quarantine as of March 10, 2021.

## II.    FACTUAL BACKGROUND

### A. S.C.'s COVID-19 tests and isolation; the children's quarantine.

On February 25, after feeling a slight swelling in her thyroid, S.C. sought care at American Medical Center ("AMC") with concerns of hyperthyroidism. S.C. filled out a Guam Public Health Laboratory COVID-19 Form and indicated that since November 2020, she has experienced a cough (new-onset) and throat discomfort. Ex. 11. S.C. also indicated that her pre-existing medical conditions include diabetes mellitus, hypertension only (high blood pressure), and that she is a current smoker. *Id.* Nathan Berthiaume, a nurse practitioner at AMC, diagnosed S.C. with post-nasal drip and possibly asthma and administered a RAPID Abbott ID Now COVID-19 test ("RAPID test"). When the test came back positive, Berthiaume informed S.C. that she and her family were COVID-positive and provided her paperwork from DPHSS regarding isolation. Testimony of ("Test.") S.C. Berthiaume also informed S.C. that he could not give S.C. a second COVID-19 test because she had COVID antibodies. *Id.*

Following S.C.'s appointment, Berthiaume reported her COVID-19 diagnosis to DPHSS. DPHSS then initiated its positive COVID-19 protocol for S.C. Test. Chima Mbakwen. Under its protocol, once DPHSS determines an individual is COVID-positive, the individual is assigned a case investigator who then gathers information on the individual. *Id.* The process includes contacting and interviewing the individual and investigating other people that the individual came in contact with over the preceding seven days. Test. Dr. Cabrera.

Contact tracing involves DPHSS investigating individuals determined to be "close contacts." Under DPHSS Guidance Memoranda 2020-43, a "close contact" is someone who was within six feet of an infected person for a cumulative total of fifteen minutes of a twenty-four hour period from two days before illness onset (or, for asymptomatic patients, two days prior to test specimen collection) until the time the individual is isolated. Close contacts must take a test and, regardless of the result, quarantine at home for fourteen days. DPHSS determined that S.C.'s four minor children remained in close contact with her. For these "close contacts" within a household, DPHSS restarts a fourteen-day home quarantine starting on the first day of the COVID-positive individual's clearance from isolation.

After finding out the results of the RAPID test, S.C. contacted Dr. Shieh, her primary care physician for the last ten or eleven years, including twenty-two visits over the last year. Test. Dr. Shieh. S.C.'s COVID-19 diagnosis alarmed Dr. Shieh because her underlying medical conditions place her in a high-risk category if she contracted COVID-19. *Id.* S.C. suffers from diabetes, hypertension, and obesity. *Id.* Furthermore, S.C.'s cough was attributable to medication that Dr. Shieh prescribed to treat these medical conditions. *Id.*

Due to S.C.'s high-risk status, Dr. Shieh recommended that S.C. obtain an RT-PCR test that day to confirm the results of the RAPID test. *Id.* S.C. procured RT-PCR tests for her son,

E.C., and herself that same day from the Seventh Day Adventist Clinic. Test. S.C. The tests, processed by Diagnostic Laboratory Services, Inc. ("DLS"), came back negative. Req. Hr'g, Ex. 2. A few days later, on March 1, 2021, Dr. Shieh recommended that S.C. take a second RT-PCR test. *Id.* The second test, also processed by DLS, came back negative. Req. Hr'g, Ex. 3.

Following her COVID diagnosis, a DPHSS supervisor named Helen emailed S.C. with information regarding her home isolation. On March 2, S.C. testified that she spoke to a DPHSS representative named Tiara. S.C. informed Tiara that she sought medical care at AMC due to her concerns with her thyroid. S.C. testified that Tiara did not inquire about the symptoms that S.C. reported at AMC; instead, Tiara inquired about how S.C. was presently feeling. Tiara also asked whether S.C.'s children were experiencing any symptoms associated with COVID-19. In a subsequent report, Tiara noted that S.C. was not experiencing any COVID-19 symptoms and that the reason S.C. sought care at AMC related to her children swimming and getting a cold. Ex. 11. S.C. testified, however, that she did not inform Tiara that the children got a cold.

At some point, S.C. submitted her second negative RT-PCR test to DPHSS. After confirming that S.C. was symptom-free, DPHSS released S.C. from home isolation on March 4, 2021. According to DPHSS, it uses a policy adopted from the CDC's interim guidance titled "Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings." Test. Dr. Cabrera; *See also* Req. Hr'g, Ex. 5. Under the policy, an individual that receives two negative RT-PCR tests at least twenty-four hours apart may be released from home isolation. Accordingly, S.C.'s negative RT-PCR tests on February 25 and March 1 made her eligible for release from isolation.

Once DPHSS released S.C. from home isolation on March 4, it no longer considered her COVID-positive. However, because it's unknown if or when any of the children contracted

COVID-19, DPHSS restarted their fourteen-day home quarantine. Throughout their quarantine, which began on February 25, the children have remained in-doors and have experienced issues printing their school assignments. The children's scheduled release is March 19, at which point they will have been under government quarantine for twenty-three days.

### B. DPHSS Testing Protocols

Petitioners' primary argument is that S.C. never contracted COVID-19 and the February 25 RAPID test generated a false positive result. It follows, according to Petitioners, that S.C.'s four minor children never came into contact with an infected person and they pose no substantial risk of transmitting a contagious or possibly contagious disease to others. Petitioner's argument turns on the reliability of testing for COVID-19, which has been expounded upon in great detail throughout the consolidated hearings, including during the most recent hearings on March 8 and 9. Accordingly, the Court first turns to the evidence presented regarding testing.

The reliability of testing for COVID-19 is determined by the test's specificity and sensitivity. Test. Dr. Cabrera. Specificity refers to whether the test returns a positive result for the virus that it is meant to be testing for--in other words, whether a positive test result for COVID-19 accurately represents the presence of COVID-19, rather than something else. Sensitivity refers to the test's efficiency in detecting the presence of the COVID-19 virus in a test sample.

DPHSS primarily relies on two types of COVID-19 tests: RT-PCR tests and RAPID tests. DPHSS has relied on the RT-PCR test throughout the COVID-19 pandemic. The Court in *Ikei v. DPHSS* summarized the RT-PCR test as follows:

> When testing persons in government quarantine facilities, DPHSS primarily
> uses a RT-PCR/molecular test ("PCR test"). This is the "nose-swab test" and it
> works by detecting the presence of the virus in one's nose. When used on

persons not previously infected with COVID-19, a PCR test yields a 99% accuracy rate.

SP0138-20 (Findings of Fact and Concls. of Law ("FFCL") at 5 (Oct. 27, 2020)). With the RAPID test, a more recent DPHSS testing implementation, the samples are also taken via a nose-swab and detects the virus' presence in the sample.

The testing method for each test, however, differs. With the RT-PCR test, the testing sample is sent to a laboratory with results obtained up to multiple days later. With the RAPID test, results are ascertained by using a machine located on-site. The RAPID test is completed in an out-patient setting and results are returned in approximately fifteen minutes. Test. Dr. Cabrera.

The RT-PCR testing method provides greater sensitivity in detecting the presence of the virus. Laboratories provide greater safeguards to various errors that may occur in the several steps involved in testing. Test. Dr. Cabrera. For instance, a sample may be misidentified or the testing environment may contaminate the sample. *Id.* Since laboratory medicine is a strict disciple, utilizing a laboratory mitigates against these potential errors.

Another factor that impacts sensitivity is the individual's pretest probability of infection. Pretest probability refers to the medical determination, prior to testing, of whether an individual displays signs that if they test positive for COVID-19, they have it. In determining an individual's pretest probability, the medical professional administering the test looks for symptoms associated with COVID-19[1], reviews the patient's medical history, and performs a physical exam. When a patient presents a high pretest probability, DPHSS instructs medical providers to order a COVID-19 test.

---

[1] Symptoms associated with COVID-19 include cold or flu-like symptoms; respiratory issues, such as loss of breath or coughing; loss of taste; muscle or body aches; gastrointestinal issues.

High pretest probability results in greater testing sensitivity because the symptoms indicate a greater presence of the virus in the body. According to one study, when an individual presents a high pretest probability, the RAPID test produces an accuracy rate of over 99%. Test. Dr. Cabrera. Similarly, the accuracy of an RT-PCR is impacted by whether an individual is symptomatic. The optimal time to test for COVID-19 using a RT-PCR test is between days five and seven of infection, which aligns with when one is most infectious; an individual is most infectious when they are symptomatic. *Ikei*, SP0138-20 (FFCL at 4) (citing Ex. XX).

Conversely, asymptomatic individuals--or individuals that do not present a high pretest probability--have less of the virus present. With a smaller viral load, testing sensitivity is less reliable. As a result, testing with an RT-PCR test prior to day five of infection is not recommended. *Ikei*, SP0138-20 (FFCL at 4). Furthermore, the RAPID test, which is less sensitive to detecting the presence of the virus than an RT-PCR test, is recommended to be limited to only those individuals who are within the first seven days of the onset of symptoms.

Considering, however, that approximately 50% of individuals infected with COVID-19 are asymptomatic, both tests are used on asymptomatic individuals. DPHSS uses the RAPID test in emergency room situations, regardless if the individual presents symptoms. Test. Dr. Cabrera. Because an RT-PCR test provides greater sensitivity to detecting the presence of the virus, however, it is the more reliable method of testing asymptomatic individuals.

As a matter of policy, DPHSS does not investigate the possibility of a false positive. Test. Dr. Cabrera. Rather, it follows the CDC guidelines instructing that an individual who receives two negative RT-PCR tests, at least twenty-four hours apart, may be released from home isolation. *Id.* The negative RT-PCR tests determine whether the person is infectious, not whether the diagnosis is correct. *Id.*

## III.    LAW AND DISCUSSION

### A.  DPHSS may rely on the RAPID test result.

The quarantine of S.C.'s children hinges on whether S.C.'s RAPID test result was a false positive and, in light of evidence questioning the validity of the RAPID test result, whether DPHSS can continue to rely upon it with reference to S.C.'s children.  This analysis therefore looks at both the chance that the test generated a false positive result, and then, the law governing DPHSS' decision to quarantine the children.

At the hearing, DPHSS argued that the barometer for identifying a false positive is re-testing the same sample.  Test. Dr. Cabrera.  Accordingly, since S.C.'s tests involved two different samples, there is a 50% chance that the RAPID test was a false positive.  *Id.* Nonetheless, DPHSS argues that its reliance on S.C.'s COVID-positive diagnosis is justified. DPHSS points to the Guam Public Health Laboratory COVID-19 Form that S.C. filled out at AMC on February 25.  On the form, S.C. indicated that since November 2020, she has experienced a cough (new-onset) and throat discomfort.  Ex. 11.  According to DPHSS, S.C.'s report of experiencing a cough indicates the presence of a COVID-19 symptom, which increases the likelihood that the RAPID test produced an accurate result.  Test. Dr. Cabrera.  Furthermore, S.C. indicated that her pre-existing medical conditions include diabetes mellitus, hypertension only (high blood pressure), and that she is a current smoker.  Ex. 11.  DPHSS believes that S.C.'s pre-existing medical conditions increase the chances that she contracted COVID-19 and place her at high-risk for complications associated with contracting the virus.  Test. Dr. Cabrera. DPHSS concluded that the best practice was to treat S.C. as if she had COVID-19.  *Id.*

S.C. argues that there is additional evidence presented that increases the likelihood that the RAPID test was a false positive.  Specifically, she points to her pre-existing conditions,

which she claims were misdiagnosed as COVID-19 symptoms. It follows, according to S.C., that since she had not experienced COVID-19 symptoms within the previous seven days, she does not fall within those recommended to take the RAPID test. The evidence presented, however, does not indicate that testing an individual with no symptoms associated with COVID-19 would lead to a false positive. The recommendation addresses the sensitivity of the test detecting COVID-19. If an individual is infected with COVID-19 but has not experienced COVID-19 symptoms within the previous seven days, they are asymptomatic. Asymptomatic individuals have a smaller viral load, and the reliability of the test would hinge on whether it has the sensitivity to detect the presence of COVID-19. The potential fallacy addressed, therefore, is a false negative, not a false positive.

S.C. also argues that DPHSS has the burden to prove by a preponderance of the evidence that it was not a false positive; and since it could only assert that there is a 50% chance that the test was accurate, it has not met the burden. Such a finding, however, contravenes DPHSS' policy decisions to rely on the initial diagnosis and not investigate potential false negative tests. The Court is reluctant to compel a change in DPHSS' policy based on caselaw regarding public health emergencies.

In *Ikei*--issued five months ago--this Court noted that many courts confronted with government restrictions resulting from the COVID-19 pandemic have relied on *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11 (1905), a one hundred-year-old U.S. Supreme Court case evaluating state action during a public health emergency. To this day, courts continue to cite *Jacobson* for its holding that public health laws should stand unless having "no real or substantial relation" to the health crisis or are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id.* at 31. This Court also tempered its reliance on

*Jacobson* based on more recent COVID-19-era cases that struggled with using *Jacobson's*

deference to public health authorities given the duration of the pandemic and its effect on civil

liberties. SP0138-20 (FFCL at 13-14 (citing federal decisions and opinions hesitant to extend

*Jacobson*)). As this Court stated in *Ikei,*

> While this Court continues to give the benefit of the doubt to DPHSS when it
> administers measures to fight a pandemic, it cannot help but find that there is no
> end to the present public health emergency. . . . When examining whether
> DPHSS has lawfully quarantined individuals for any term, the Court must
> carefully analyze the "reasonably necessary," "least restrictive means," and
> "substantial risk" tests to determine if DPHSS has satisfied the legislative
> principles announced in section 19604.

SP0138-20 (FFCL at 15).

When applying this careful analysis to S.C.'s case and DPHSS' testing policies, the Court

defers to DPHSS' position to accept the validity of a RAPID test result because of its minutely

low rate of producing a false positive outcome for persons with symptoms. Having a less than

one percent chance of producing a false positive result, the RAPID test fails to present this Court

with a question regarding its reliability, and DPHSS has not erred in relying upon it. Even at a

fifty percent probability rate of a false positive test result, given the presence of reported

symptoms, DPHSS still meets the standard of implementing a policy that has a real and

substantial relationship to DPHSS' aim to contain the spread of COVID-19. Also, DPHSS'

policy, adopted from CDC guidelines, of releasing an individual from home isolation if they

submit two negative RT-PCR tests, at least twenty-four hours apart, adequately protects those

interests.

The Court acknowledges S.C.'s evidence of other indications that question the test result.

First, she immediately took the RT-PCR test, which is even more reliable than the RAPID test.

She received a negative result; she retested a few days later and again received a negative result.

Second, her cough symptoms resulted from medication and were chronic as opposed to sudden.

Despite these indications that the RAPID test result may be incorrect, this Court still cannot find

fault in DPHSS' policy relying on the test result. Instead, when it comes to the uncertainties of a

pandemic, DPHSS may and should continue to enforce a policy that relies on a highly credible

test accompanied by a report of a COVID-19-like symptom.

So while this Court continues to carefully scrutinize DPHSS' response to potential

infections--particularly in the arena of the deprivation of civil liberties induced by mandatory

quarantine and isolation and the conditions of quarantine and isolation--DPHSS' reliance on

testing and S.C.'s medical reports of COVID-19 symptoms bear more than a substantial

relationship to the end goal of controlling the spread of COVID-19. In other words, the Court

finds no error in DPHSS' determination that S.C. was COVID-positive. In turn, DPHSS

properly implemented a quarantine for S.C.'s children.

### B. DPHSS Has Not Demonstrated that S.C.'s Children Continue to Pose a Substantial Risk of Transmitting COVID-19

The final question examines the timing and timeline of the fourteen-day quarantine.

Although DPHSS believes that this Court has endorsed the fourteen-day quarantine, it is not

correct. While the Court has heard dozens of petitions involving incoming passengers, none of

the passengers have challenged the need to continue to quarantine at home once they left the

government facility; instead, they have begged for home quarantine as a less restrictive

alternative to government facility quarantine. S.C.'s children are the first quarantined individuals

who have questioned their home quarantine.[2]

---

[2] In SP0202-20, an on-island resident challenged his quarantine, but the parties resolved the matter before the Court reached the merits.

While the Court has not previously reviewed the validity of a full fourteen-day quarantine at home, the Court has spoken about the decline of infectiousness over the span of the fourteen days. In *Ikei*, this Court concluded:

> [A] fourteen-day term of government quarantine for asymptomatic travelers makes little sense when compared with the term imposed on asymptomatic, positive COVID-19 persons--such persons are released from isolation on day ten because they are not likely infectious. Since the worst-case scenario for an individual that is asymptomatic and refuses to test on day six is that they are infected with COVID-19, the Court does not see any reason for the distinction. Again, the evidence presented before the Court demonstrates that asymptomatic persons have a low rate of infectiousness on day ten, and virtually no infectiousness beyond that day. **In other words, at day ten, they do not pose a substantial risk of transmitting the virus.**

SP0138-20 (FFCL at 23) (emphasis added). The Court's ruling was based on a chart produced by DPHSS that indicates that asymptomatic persons have little to no infectiousness on day ten, and thus, no substantial risk of transmitting COVID-19. SP0138-20 (Ex. XX).[3] DPHSS has not brought forth evidence to refute what the Court ruled in *Ikei*. Instead, it has enforced the day-ten transfer to home quarantine as later ordered by this Court. Order (Nov. 5, 2020) (mandating DPHSS to release asymptomatic persons who refuse to test from government facility quarantine by day ten).

The question about substantial risk derives from Guam law: when a person no longer poses a "substantial risk" of transmitting a contagious or possibly contagious disease to others, then the person is to be immediately released from isolation or quarantine. 10 GCA §

---

[3] The CDC's current, published guidance to public health authorities indicates that by day nine, asymptomatic persons have an insubstantial risk of transmitting COVID-19. Science Brief: Options to Reduce Quarantine for Contacts of Persons with SARS-CoV-2 Infection Using Symptom Monitoring and Diagnostic Testing, https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html (last visited Mar. 11, 2021). This authority was not presented during these proceedings. Instead, DPHSS continues to rely on the testimony of witnesses as to their interpretation of CDC guidance.

19604(a)(5).[4] Based on the evidence presented to this Court that an asymptomatic person is no longer infectious on day ten, one's substantial risk of transmission expires on day ten, regardless of whether their quarantine occurs at a hotel or at home.

The Court must then determine when the quarantine period should have begun. DPHSS initiated the quarantine period on February 25, 2020--the date S.C. received her positive RAPID test result. DPHSS argues that the children's quarantine restarted on March 4 when it released S.C. The purpose of restarting the clock is because it is unknown if or when a close contact contracts COVID-19, and to be safe, DPHSS assumes that it could occur up until the moment a positive COVID-19 patient is released from isolation.

However, Dr. Cabrera testified before this Court that S.C. stopped posing a substantial risk of COVID-19 when her second RT-PCR test sample was collected on March 1. Taking that as the last date of contact with a potentially infectious person, March 2 became day one for the children's quarantine. The tenth day--the date that the children would stop being considered a substantial risk of transmitting COVID-19 if contracted--is March 11, 2021. This of course assumes that that children have been asymptomatic.

The Court rejects DPHSS' argument to add on time for it to "clear" the isolated person. S.C.'s risk of transmission became insubstantial when the test verified she was no longer infectious; it did not become insubstantial when DPHSS found the time to look at her records and give her a call. While DPHSS can continue to verify an isolated person's lack of symptoms following a negative test result, for the purposes of calculating a quarantine restart for close

---

[4] There has been some argument regarding whether the children's quarantine satisfies section 19604(b)(1) which states that "isolation and quarantine must be by the least restrictive means necessary to prevent the spread of a contagious or possibly contagious disease to others." 10 GCA § 19604(b)(1). Here, however, S.C.'s children do not seek a "less restrictive" quarantine; they seek a full release from quarantine. The Court does not find the "less restrictive" analysis applicable to the facts presented.

contacts, the day of the sample--as stated by Dr. Cabrera--must define the date one is no longer at

substantial risk of transmission.

## IV.    CONCLUSION

The Court finds DPHSS has the discretion to rely on RAPID test results, including S.C.'s

positive test result. However, it has not demonstrated that S.C.'s children pose a substantial risk

of transmitting COVID-19 beyond March 11, 2021, as long as they are asymptomatic. As no

evidence has been presented as to the children's symptoms, the Court ORDERS S.C. to report

any symptoms to DPHSS. If none of the children have experienced symptoms, the Court

ORDERS DPHSS to release the children from further quarantine beyond today, March 11, 2021.

SO ORDERED this 11th day of March 2021.

HON. ELYZE M. IRIARTE<br>
Judge, Superior Court of Guam

Appearing Attorneys:
Assistant Public Defender Brian Eggleston, Public Defender Service Corporation, for S.C., E.C.,
        Jr., G.C., E.C., and E.C
Assistant Attorneys General Janice Camacho and Joseph Perez, Office of the Attorney General
        of Guam, for DPHSS